IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AARON ROSS           *

v.               *   Civil No. JFM-09-3255

WAYNE EARLY, *et al.*       *

******

MEMORANDUM

Plaintiff Aaron Ross ("Plaintiff" or "Ross") has brought this action against Baltimore City Police Officer Wayne Early ("Officer Early"), as well as the Mayor and City Council of Baltimore ("the City"); Baltimore City Police Department ("BPD"); George Nilson, City Solicitor; Elena DiPietro, Chief Solicitor for the City; Linda Barclay, former Chief Solicitor for the City; and Frederick H. Bealefeld, III, Commissioner of BPD (collectively, excluding Officer Early, "the City Defendants"). Plaintiff alleges, among other things, violations of his federal constitutional rights to assembly and free speech and to be free from unreasonable searches and seizures. Pending before the court is Defendants' Joint Motion for Summary Judgment and Plaintiff's Counter-motion for Summary Judgment.[1] I held a hearing on these Motions on October 1, 2010. I will now deny all Motions.

I.

In March of each year, since at least 2003, the City has leased First Mariner Arena ("the Arena") to Feld Entertainment for performances of the Ringling Brothers Barnum and Bailey Circus ("the Circus"). These performances attract large crowds. Between seven thousand and ten thousand patrons attend weekday shows, which begin at 7:30 p.m. (Joint Mot. Summ. J.

---

[1] Officer Early has also filed a motion for summary judgment as to state law claims asserted against him by Plaintiff. The issues raised by that motion are different from the federal constitutional issue I directed the parties brief. Therefore Early's Motion for Summary Judgment will be denied without prejudice to file renewed.

("Joint Mot."), Ex. 1 Affidavit of Linda C. Barclay ("Barclay Aff.") ¶ 18; Joint Mot., Ex. 4 Mayor and City Council of Baltimore's Answers to Interrogatories ("City's Answers to Interrogs."), no. 3.) Many patrons begin queuing on the sidewalk around the Arena at 6:00 p.m. in anticipation of the doors opening at 6:30 p.m. (Barclay Aff. ¶ 20; Joint Mot., Ex. 3 Deposition of Linda C. Barclay, Esquire ("Defs.' Barclay Dep.") 62:9–15.) Due to the location of the Arena, this area also experiences heavy pedestrian and automotive traffic before each performance as a result of the afternoon rush hour. One particular source of congestion is the approximately fifty Mass Transit Administration (MTA) buses that stop outside the Arena between 6:30 and 7:30 p.m. on weekdays. (Barclay Aff. ¶ 10; City's Answers to Interrogs., no. 3.) Additionally, these performances gave rise to protests and demonstrations by animal welfare activists who oppose the Circus, including Ross. Defendant Wayne Early, an officer with the Baltimore City Police Department, was present at these protests during the relevant years not only as a police officer, but also because a company that he co-owns, E&W Security, contracted with Feld Entertainment to provide security for the Circus. (Pl.'s Opp. Mot. Summ. J. and Counter-mot. Summ. J. ("Pl.'s Opp."), Ex. 25 Deposition of Wayne Early ("Pl.'s Early Dep.") 49:13–52:2.)

Prior to 2004, the City did not have a policy or protocol restricting the conduct of these demonstrators,[2] and the City's adoption of the protocol at issue here was a response to events that occurred during the 2003 protests. (Barclay Aff. ¶ 4.) On March 12, 2003, People for the Ethical Treatment of Animals (PETA) requested a permit to park a truck next to the Arena prior to that night's Circus performance. (*Id.* at ¶¶ 6–7.) Defendant Linda Barclay, then Chief of the Legal Counsel Division in the City's Law Department, determined that the City should issue the

---

[2] For brevity, I use the term "demonstrators" to refer to both those engaged in protest activities, such as chanting and picketing, and those engaged in leafleting, but I note that these are distinct expressive activities.

permit. After viewing the site, she selected a location for the truck she believed would not interfere with traffic patterns, including the three bus stops in front of the Arena. (*Id.* at ¶¶ 8–9; Joint Mot., Ex. 5 George Winfield Mar. 11, 2003 Email; Joint Mot., Ex. 6 Linda Barclay Mar. 2003 Email.) Defendant Barclay's belief was incorrect. The truck's position obstructed the flow of traffic, and MTA buses began to double park, causing passengers to enter the road to reach their buses. Only after MTA police and Lieutenant Bailey of the BPD Central District reported to the scene were the police able to unravel the morass. (Barclay Aff. ¶¶ 10–13; City's Answers to Interrogs., no. 3.)

The Defendants assert that the demonstrators on the sidewalk also disrupted pedestrian traffic. The City and its employees, however, have not articulated specific problems caused by these demonstrators beyond their mere presence in the area. (*See* Defs.' Barclay Dep. 94:6–10 (reporting only that the demonstrators were "mingling with the large crowds").) In 2003, City officials discussed, but rejected, possible restrictions on sidewalk demonstrators beyond those imposed by generally applicable criminal law. Peter Saar, then acting Chief Legal Counsel for BPD, advised Officer Early on March 13, 2003, that demonstrators could approach and offer literature to people throughout the entire sidewalk surrounding the Arena, and police should intervene only if there was a criminal violation or the demonstrators engaged in behavior akin to aggressive panhandling. (Pl.'s Opp., Ex. 23 Email Chain with Linda Barclay, Ernest Crofoot, and Peter Saar.)

Although the evidence indicates the prior year's problems arose primarily as a result of the placement of the PETA truck and there was no subsequent request for a truck permit, in 2004, Defendant Barclay issued a written protocol regarding the location of sidewalk

demonstrators prior to Circus performances ("the Protocol"[3]).  (Joint Mot., Ex. 8 2004 Linda Barclay Protocol Email ("2004 Protocol").)  In 2004, the Protocol imposed the following restrictions:

1. On the east side of the Arena, demonstrators were required to stand on the sidewalk along Hopkins Place.  (2004 Protocol; *see also* Joint Mot., Exs. 9a & 9b Photographs of Hopkins Place Sidewalk in front of Arena's Main Entrance.)

2. On the north side of the Arena, demonstrators were permitted only within a fourteen foot-wide area of sidewalk adjoining the street ("the designated area"), which was demarcated by a brick border, and demonstrators could not enter the fifteen feet of sidewalk closest to the Arena.  (2004 Protocol; *see also* Joint Mot., Ex. 10 Photograph of West Baltimore Street next to Arena; Pl.'s Opp., Ex. 10 Affidavit of Sean R. Day, at ¶ 2 (providing measurements).)  Plaintiff's arrest occurred in this area.

3. On the west side of the Arena, demonstrators were not allowed to protest due to the narrow sidewalk.  (2004 Protocol.)

In subsequent years, the City continued to use the Protocol, which Defendant Barclay and her successor, Defendant DiPietro, reissued by email.  The only change in the Protocol involved the sidewalk on the west side of the Arena.  After 2004, the Protocol permitted demonstrators on the sidewalk at the corner of Howard Street and Baltimore Street and in the middle of the block south of the Howard Street entrance to the Arena.  (Barclay Aff. ¶¶ 25–26; Joint Mot., Ex. 12 Mar. 6, 2007 Linda Barclay Email Chain ("2007 Barclay Email Chain"); Joint Mot., Ex. 13 2009 Elena DiPietro Protocol Email ("2009 Protocol"); Joint Mot., Ex. 11 Photograph of Arena's Howard Street Entrance.)

---

[3] In their motions to dismiss, the City Defendants contended this protocol constituted only "legal advice," rather than municipal policy, so they could not be held liable under 42 U.S.C. § 1983.  (*See* Defs. Mayor and City Council of Baltimore, George Nilson, Linda Barclay, and Elena DiPietro's Mot. Dismiss ("City Defs.' Mot. Dismiss"); Defs. Baltimore Police Department and Police Commissioner Frederick Bealefeld's Consolidated Mot. Dismiss ("BPD Defs.' Mot. Dismiss").)  The court denied the motions without prejudice.  Defendants incorporate these arguments by reference.  They have not presented facts that would lead me to conclude they were only providing legal advice, and their argument that the Protocol did not constitute municipal policy remains unconvincing.  In fact, Defendant Barclay repeatedly referred to the protocol as a "policy" during her deposition.  (*See, e.g.*, Pl.'s Opp., Ex. 24 Deposition of Linda C. Barclay, Esquire 20:21, 23:12, 24:14, 131:10–20.)  Accordingly, I will not grant summary judgment for the City Defendants on these grounds.

Defendant Barclay states that the Protocol applied to "[a]ny demonstrators that were desiring to exercise their First Amendment rights during the period of the circus." (Pl.'s Opp., Ex. 24 Deposition of Linda C. Barclay, Esquire ("Pl.'s Barclay Dep.") 135:7–9.) There is, however, conflicting evidence on the record about whether the Protocol was in fact generally applicable. The Defendants submitted an affidavit by Mark Tognocchi, event manager of the Arena, who attests that on the day Plaintiff was arrested in 2009, he instructed religious demonstrators to remain within the designated area,[4] and, on other occasions, he had applied the Protocol to individuals who were not animal welfare demonstrators. (Joint Mot., Ex. 14 Affidavit of Mark Tognocchi ("Tognocchi Aff.") ¶¶ 4–10.) Plaintiff, however, has submitted affidavits of past demonstrators stating they witnessed the police allow leafleters and vendors to remain outside of the designated area while applying the Protocol to those demonstrating against the Circus. (Pl.'s Opp., Ex. 11 Affidavit of Robin Helfritch ("Helfritch Aff.") ¶¶ 2–8; Pl.'s Opp., Ex. 26 Affidavit of Erin Marcus ("Marcus Aff.") ¶¶ 6–9.) In addition, Officer Early stated that he knew that the Protocol applied to Ross "[b]ecause [he was] actually protesting against the treatment of animals" (Pl.'s Early Dep. 28:5–6), and the 2009 email disseminating the Protocol described it as applying to "Circus Protesters." (2009 Protocol.)

Plaintiff Aaron Ross was arrested in both 2008 and 2009 for failing to obey a lawful order because he refused to comply with Officer Early's orders that he return to the designated area. On March 12, 2008, Ross was distributing leaflets on the sidewalk on the north side of the Arena outside of the designated area. After Ross refused to comply with Officer Early's

---

[4] Video of Plaintiff's arrest captures this event and sheds light on its context. *See Scott v. Harris*, 550 U.S. 372, 380–81, 127 S. Ct. 1769 (2007) (declaring that, when considering a summary judgment motion, a court should "view[] the facts in the light depicted by [a] videotape" of the incident). Prior to directing the religious demonstrators to the designated area, Tognocchi was standing between the camera and Plaintiff, continually moving so as to block the camera's view of the arrest. Just before Tognocchi encountered them, the religious demonstrators walked in front of the camera. Tognocchi then requested that they move into the designated area. (Pl.'s Opp., Ex. 15 Video of 2009 Arrest.)

repeated requests to stand behind the brick border in the designated area, Officer Early placed him under arrest. On March 25, 2009, Officer Early again arrested Ross for failure to obey a lawful order when Ross refused to cease distributing leaflets outside of the designated area north of the Arena. (Joint Mot., Ex. 2 Deposition of Wayne Early ("Defs.' Early Dep.") 9:18–12:19, 37:18–41:3.) Both arrests were captured on video by other demonstrators. (Pl.'s Opp., Ex. 12 Video of 2008 Arrest ("2008 Arrest Video"); Pl.'s Opp., Ex. 15 Video of 2009 Arrest ("2009 Arrest Video").) At the time of the 2009 arrest, Officer Early was wearing a shirt containing a pro-deer hunting slogan, "Will Hunt 4 Bucks." (Pl.'s Opp., Ex. 13, Affidavit of Aaron Ross ("Ross Aff.") ¶ 9.) Plaintiff reports that, after this arrest, Officer Early took him to a police station rather than Central Booking, refused to permit him to use the restroom, threatened to have him held for thirty days, and abandoned him at the station. (*Id.* at ¶¶ 11–13.)

Plaintiff has asserted claims falling into two categories: (1) common law and constitutional torts against Officer Early,[5] and (2) claims pursuant to 42 U.S.C. § 1983 against the City Defendants for violating of Plaintiff's rights under the First and Fourth Amendments.[6]

II.

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court of the United States explained that in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to

---

[5] The state law claims against Officer Early include: (1) false arrest for the 2008 arrest (Count I); (2) violation of Md. Const., Declaration of Rights, Art. 26 for the 2008 arrest (Count II); (3) false arrest for the 2009 arrest (Count VI); (4) false imprisonment for the detention following the 2009 arrest (Count VII); and (5) violation of Md. Const., Declaration of Rights, Art. 26 for the 2009 arrest (Count VIII). As indicated in footnote 1, I am denying a motion for summary judgment filed by Officer Early as to these claims without prejudice to the file the motion by renewal.
[6] These include a claim against Defendants Bealefeld, Nilson, and Barclay for the 2008 arrest (Count IV) and against these Defendants, as well as Defendant DiPietro, for the 2009 arrest (Count X). The City and BPD are sued for the 2008 arrest (Count V) and the 2008 arrest (Count XI).

determine whether there is a genuine issue for trial." 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party. *Id.* at 255.

On the present record and on the claims being asserted by Plaintiff, three possible outcomes could occur. First, as discussed in section III, *infra,* it might be found that the policy adopted by the City is facially unconstitutional. Second, as discussed in section IV, *infra*, it might be found that the policy adopted by the City is constitutional but that the policy was unconstitutionally applied by the BPD and Officer Early. Third, as discussed in section V, *infra*, it might be found that the policy adopted by the City is constitutional and was constitutionally applied. Which of these outcomes happens turns on factual determinations that must be made by the jury.

### III.

Plaintiff argues the Protocol is facially unconstitutional under the First Amendment, while Defendants contend it withstands constitutional scrutiny as a reasonable time, place, and manner restriction. In evaluating Plaintiffs' First Amendment claim, the court must first determine whether Plaintiff has engaged in protected speech. *Goulart v. Meadows,* 345 F.3d 239, 246 (4th Cir. 2003) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 797, 105 S. Ct. 3439 (1985)). Next, the court must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797. Then, the court may determine whether the characteristics of the restriction at issue satisfy the applicable standard. *See id.*

This case involves speech at the core of First Amendment protection. "Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377, 117 S. Ct. 855 (1997). Nevertheless, it is well established "that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S. Ct. 2559 (1981) (citations omitted). "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech," so long as the restrictions (1) are content neutral, (2) serve a significant government interest, (3) "'leave open ample alternative channels for communication of the information,'" and (4) are narrowly tailored to the government's interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065 (1984)).

I conclude as a matter of law that the Protocol is a content-neutral restriction, serves a significant government interest, and permits sufficient alternative channels for communication. I further conclude, however, that there is a genuine dispute of fact regarding the tailoring of the Protocol.

    A. <u>Content Neutrality</u>

The scrutiny that a court must apply to a restriction on speech depends upon whether it is content neutral, content based, or viewpoint based. A content-neutral time, place, and manner restriction will be upheld if it is "narrowly tailored to serve a significant government interest . . . and leave[s] open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry*

8

*Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948 (1983).  In contrast, a content-based restriction on speech in a public forum is permissible only if the government shows that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.*  Viewpoint-based restrictions are prohibited.  *Pleasant Grove City v. Summum*, --- U.S. ---, 129 S. Ct. 1125, 1132 (2009).

"[T]he government's purpose" is the "threshold consideration" in determining whether a restriction is content neutral or content based.  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763, 114 S. Ct. 2516 (1994).  "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark*, 468 U.S. at 295).  A court therefore must find the restriction to be content neutral "if it is *justified* without reference to the content of the violator's message or point of view." *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 649 (4th Cir. 1995) (emphasis added) (citations omitted).

A regulation does not become content or viewpoint based merely because the government, in promulgating it, was motivated to respond to the conduct of one ideological group.  *Hill v. Colorado*, 530 U.S. 703, 724, 120 S. Ct. 2480 (2000).  Nor is it content based because "it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *see also Am. Life League*, 47 F.3d at 651 ("[A] statute is not rendered non-neutral simply because one ideologically defined group is more likely to engage in the proscribed conduct.").  In fact, an ordinance that expressly limits speech based on its content may nonetheless be content neutral so long as the ordinance's purpose is not to suppress the targeted

9

content, but rather to "combat the undesirable secondary effects" of the speech.[7] *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S. Ct. 925 (1986) (upholding a zoning ordinance applicable only to theaters showing adult films because its purpose was related to the films' secondary effects).

Here, the Protocol is content neutral. Although Defendant Barclay was responding to the prior conduct of animal welfare demonstrators at the time she created the Protocol and she intended the Protocol to affect these demonstrators' conduct, this does not render the law content based. Rather, the focus must be on the government's purpose in promulgating the Protocol, and the evidence on the record demonstrates that the Protocol's purpose was to confront the undesirable secondary effects of the protests—namely, traffic and pedestrian congestion. Defendant Barclay's testimony establishes that she drafted the Protocol in response to the traffic problems that occurred during the 2003 protest and police complaints of pedestrian-flow issues around the Arena. Plaintiff has failed to present any evidence to counter this conclusion. The "Circus Protesters" subject line in emails transmitting the Protocol does not show it is content or viewpoint based. Even if the Protocol applies only to those protesting the Circus, it remains

---

[7] In order for a restriction that applies only to speech containing a certain type of content to be considered content neutral, the targeted secondary effects must be specific to speech with that content. In *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S. Ct. 1505 (1993), the Supreme Court concluded that a ban on the distribution of commercial handbills was content based even though the government asserted content-neutral justifications, safety and esthetics. *Id.* at 429–30. The Court noted that these justifications would support a ban on the distribution of all handbills, not merely those containing commercial content, so a ban limited to commercial handbills could be supported only by a content-based justification: commercial speech was of low value. *Id.* Here, in contrast, although the City's justification—pedestrian and traffic safety and convenience—in theory could apply with equal force to all leafleters and protesters, the City has experienced problems in the area around the Arena only during the Circus and as a result of animal welfare demonstrators' conduct. (Barclay Aff. ¶ 32; City's Answers to Interrogs., no. 11.) Thus, even if the factfinder finds that the Protocol applies only to circus demonstrators, I will treat it as content neutral, rather than finding it to be content based, because it is a reaction to a specific problem that occurred in the past. If the Protocol was created to address specific past events and applied to a specific group, however, it would resemble an injunction. As I discuss *infra*, these similarities to an injunction affect the degree of tailoring required for the Protocol to comply with constitutional limits.

content-neutral rule so long as it was intended to combat only the secondary effects of the protest.[8]

### B. Significant Government Interest

It is well established that governments have a significant interest in preserving freedom of movement on public streets and sidewalks. *See Heffron*, 452 U.S. at 650 ("As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."). Indeed, municipal governments have the duty to maintain freedom of movement on public streets. *Cox v. Louisiana*, 379 U.S. 536, 554–55, 85 S. Ct. 453 (1965); *Schneider v. New Jersey*, 308 U.S. 147, 160, 60 S. Ct. 146 (1939). A government may, therefore, restrict the time, place, duration, or manner of protests and public assemblies on public thoroughfares in order to fulfill this duty. *See Cox*, 379 U.S. at 558. Plaintiff's contentions to the contrary are unavailing, and his claims that the specific protests in which he participated did not impair the safety or convenience of pedestrians are more appropriately addressed under the narrow-tailoring element.

In light of this precedent, I conclude the City, in creating the Protocol, acted to further a significant government interest.

### C. Alternative Channels of Communication

---

[8] Any contention by Plaintiff that Officer Early's financial relationship with the Circus motivated him to seek the Protocol to suppress the demonstrators' message is pure conjecture. The only evidence of animus held by Defendant Barclay towards animal welfare activists is an email in which she recalls "that stupid truck," referencing the PETA truck from the 2003 protest. (2007 Barclay Email Chain.) Even this, when viewed in context, does not render the Protocol content based. The truck caused severe traffic and safety problems because it prevented buses from stopping at their typical stops, and Defendant Barclay believed that the police held her responsible for these problems. (Barclay Aff. ¶ 14.) Mrs. Barclay, therefore, was reacting to the secondary effects of the protest, specifically traffic congestion, rather than the content of the speech. The only evidence of disagreement with content of the animal welfare demonstrators' speech is the shirt that Officer Early wore during Plaintiff's 2009 arrest, which expressed the officer's appreciation of deer hunting. The fact that a single officer held a view contrary to the demonstrators does not prove that the City was motivated by disagreement with animal welfare ideology in creating the Protocol.

11

To be reasonable, a time, place, and manner restriction must permit ample alternative channels of communication. *Ward*, 491 U.S. at 791. "An ordinance will not fail for lack of adequate alternatives as long as it provides avenues for 'the more general dissemination of a message.'" *Green v. City of Raleigh*, 523 F.3d 293, 305 (4th Cir. 2008) (quoting *Frisby v. Schultz*, 487 U.S. 474, 482–84, 108 S. Ct. 2495 (1988)). Speakers are not entitled to their ideal means of communication; the Constitution demands "only that individuals retain the 'ability to communicate effectively.'" *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 n.48 (9th Cir. 2005) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812, 104 S. Ct. 2118 (1984)). There is, therefore, no constitutional requirement that speakers be permitted to distribute leaflets provided that they are afforded other avenues to express their message. *See McCullen v. Coakley*, 571 F.3d 167, 180 (1st Cir. 2009) ("[H]andbilling is not specially protected." (citations omitted)); *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 14 (1st Cir. 2004) ("[A]lthough the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access.").

Here, although the Protocol forecloses the demonstrators' ideal means of communication, it provides ample alternative channels of communication. Plaintiff and other animal welfare activists prefer to move among the pedestrians on the sidewalk to distribute literature. Nevertheless, the parameters established by the Protocol do not bar "the more general dissemination" of their message. Plaintiff can convey his views on the Circus by providing literature to those pedestrians who pass through or near the designated area or by holding signs,

chanting, and engaging in other protest activities. Unrestricted leafleting does not gain special constitutional protection simply because it is Plaintiff's preferred means of communication.

D. Narrow Tailoring

There remains for consideration the fourth factor set forth in *Ward v. Rock Against Racism*: whether the Protocol is narrowly tailored to implement the government's legitimate interest in preventing traffic and pedestrian congestion. For reasons I will next explain, as to this factor, I find that there is a genuine issue of material fact.

In deciding the "narrowly tailored" issue, the Supreme Court has drawn a distinction between ordinances generally imposing time, place, and manner restrictions on protected speech and injunctions whose purpose is to restrict the exercise of the free speech rights of a particular group. *Compare Ward*, 491 U.S. at 797–800 (holding that, for a generally applicable ordinance, the regulation "need not be the least restrictive or least intrusive means" of serving the government's interest), *with Madsen*, 512 U.S. at 765 (holding that an injunction must "burden no more speech than necessary to serve a significant government interest"). A more rigorous standard applies in determining the constitutionality of an injunction than a general ordinance. Specifically, as is particularly pertinent in this case, the constitutionality of a general ordinance will be upheld if it addresses not only disruptive conduct that has occurred in the past but also anticipated problems of the same nature. *See City of Memphis v. Greene*, 451 U.S. 100, 126, 101 S. Ct. 1584 (1981) ("As a matter of constitutional law a city's power to adopt rules that will avoid anticipated traffic safety problems is the same as its power to correct those hazards that have been revealed by actual events."). On the other hand, in order to meet the "narrowly tailored" factor, an injunction must be focused only on past disruptive conduct that might reasonably be anticipated to re-occur. *See Madsen*, 512 U.S. at 765 ("[Injunctions] can be

13

tailored . . . to afford more precise relief than a statute where a violation of the law has already occurred."). Thus, in this case, if the Protocol is deemed to be the equivalent of a general ordinance, it would be constitutional even though it covers possible pedestrian congestion and the only past conduct which triggered it was the traffic congestion caused by the PETA truck for which a permit had been issued in 2003. On the other hand, if the Protocol is deemed to be the equivalent of an injunction, it is unconstitutional because its purpose of assuring the flow of pedestrian traffic, while valid, simply was not invoked by what had occurred in the past. While the constitutionality of the Protocol is ultimately a legal question, resolution of this question depends upon a finding as to the underlying factual issue: whether or not the Protocol was of general application or specifically targeted to circus and animal welfare protestors.

I recognize, of course, that the Protocol is not a court issued injunction but a policy adopted by the City Law Department. That fact, however, is not dispositive. Although the Fourth Circuit has not addressed the issue of *Madsen*'s applicability to restrictions other than injunctions, the Second and Third Circuits have extended the *Madsen* standard to other non-statutory restrictions because these restrictions possess characteristics that the Supreme Court identified as warranting heightened scrutiny for injunctions. *McTernan v. City of York*, 564 F.3d 636, 654–55 (3d Cir. 2009) (applying the *Madsen* standard to "a police directive, issued by officers in the field," because it "pose[d] risks similar to those presented by an injunction, warranting heightened scrutiny"); *Huminski v. Corsones*, 386 F.3d 116, 155 (2d Cir. 2004) (applying heightened scrutiny under *Madsen* to a "Notice Against Trespass," issued by court security personnel to a protester); *cf. Tompkins v. Cyr*, 995 F. Supp. 664, 678 (N.D. Tex. 1998) (considering underlying policy concerns and determining that heightened scrutiny should not

14

apply to common law torts because they resembled generally applicable statutes more than injunctions).

In *Madsen*, the Supreme Court identified several characteristics of injunctions that give rise to the need for heightened scrutiny. "First, injunctions do not emanate from deliberative, democratic decisionmaking processes," but rather "'are remedies imposed for violations (or threatened violations) of a legislative or judicial decree.'"[9] *McTernan*, 564 F.3d at 654 (quoting *Madsen*, 512 U.S. at 764). Second, because they are crafted in response to prior violations, injunctions "can be tailored . . . to afford more precise relief than a statute." *Madsen*, 512 U.S. at 765. Finally, because injunctions target specific groups, they are less likely to be subject to public scrutiny and "carry greater risks of censorship and discriminatory application than do general ordinances." *Id.* at 764. As the Court remarked in *Madsen*, "'there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.'" *Id.* (quoting *Ry. Express Agency, Inc. v. New York*, 336 U.S. 106, 112–13, 69 S. Ct. 463 (1949)).

Here, the record demonstrates that the Protocol poses many of the risks presented by an injunction. The Protocol was not created through a formal legislative or regulatory decisionmaking process. In fact, the City Defendants, in their motions to dismiss, seized on the informality of the process leading to the promulgation of the Protocol to argue that it should not be treated as a municipal policy under 42 U.S.C. § 1983. (*See* City Defs.' Mot. Dismiss; BPD Defs.' Mot. Dismiss.) The Protocol appears to have been crafted instead as a response to the

---

[9] Injunctions are not promulgated through democratic processes, but this is not to say that courts are not deliberative when determining whether an injunction should issue. In fact, the procedures imposed by the judicial system may result in greater consideration of an injunction's impact on First Amendment rights than may occur through legislative processes. Instead, the primary source of concern is that an injunction is targeted at a specific group, so it should be "'no more burdensome . . . than necessary.'" *Madsen*, 512 U.S. at 765 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S. Ct. 2545 (1979)). In contrast, a reasonable jury may find the Protocol is targeted at animal welfare demonstrators, *and* it was produced without the benefit of formal, deliberative procedures. It may therefore pose an even greater risk to the First Amendment rights of minority groups than an injunction.

disruption that occurred during the 2003 protest. Because it was created to respond to a specific problem—a truck that blocked bus lanes, preventing the uninterrupted flow of traffic—the creation of a more precise policy, addressing only demonstrators' vehicles, would be possible. Additionally, as with the police directive at issue in *McTernan*, the Protocol "present[s] potentially greater opportunities for arbitrary enforcement than injunctions" because it was not a published rule that members of the public could reference in order to conform their behavior to the law. *See McTernan*, 564 U.S. at 655 ("Whereas injunctions are written, police directives are oral. Oral directives often lack the precision and specificity required of federal injunctions . . . [and] are less amenable to judicial, executive, and public oversight."). On the video showing Plaintiff's arrest, demonstrators are seen repeatedly expressing confusion about the source of the restrictions and the interaction with their First Amendment rights. The police could not dispel this confusion because they were unable to direct demonstrators to a specific regulation or ordinance and could only instruct them to call the Law Department. (2008 Arrest Video; 2009 Arrest Video.) Finally, there is a factual dispute as to whether the Protocol was targeted against circus or animal welfare demonstrators. Although Defendant Barclay claimed she drafted the Protocol to apply generally, the email described it as a policy for "Circus Protesters." Past demonstrators stated they witnessed non-circus demonstrators against whom the BPD did not apply the Protocol during the Circus. From these facts, a jury may reasonably conclude the Protocol was written to apply only to circus and animal welfare demonstrators.

All of this said, and imperfect though the Protocol may have been, Plaintiff's facial challenge fails if the Protocol is deemed to be the equivalent of a generally applicable ordinance rather than an injunction. As previously stated, that question turns upon the determination, to be

made by the jury, whether the Protocol was targeted only against circus and animal welfare demonstrators.

IV.

In addition to bringing a facial challenge, Plaintiff contends that the Protocol is unconstitutional as applied. The same legal standard analysis applies to facial and as-applied challenges to time, place and manner restrictions. *See Independence News v. City of Charlotte*, 568 F.3d 148, 155 & n.3 (4th Cir. 2009) (applying the same time, place, or manner analysis to a content-neutral zoning ordinance "regardless of whether [the] challenge is styled as facial or as-applied").[10]

A facially constitutional time, place, or manner restriction will be unconstitutional as applied where the restriction is content neutral on its face but has been applied in a viewpoint- or content-specific manner. *Cf. Menotti*, 409 F.3d at 1146–48 (refusing to grant summary judgment for the defendant-city on the plaintiff's as-applied challenge because the evidence "create[d] a genuine issue of material fact as to whether it was the policy of the City to apply Order No. 3 in a manner that excluded only anti-WTO protestors"); *Benham v. City of Charlotte*, 682 F. Supp. 2d 549, 557 (W.D.N.C. 2010) (considering an as-applied challenge where plaintiffs "allege[d] a pattern of discriminatory enforcement" of an ordinance governing public assembly permits that was content neutral on its face). Here, a reasonable jury could find that the Protocol was written

---

[10] The Defendants interpret Plaintiff's as-applied challenge as a challenge to the government's interest in pedestrian safety and convenience because Ross claims he was not personally impeding pedestrians at the time of his arrest. The Defendants therefore assert that the government need not establish that the particular plaintiff threatened public safety or previously engaged in violence in order to implement a policy to protect public safety. This is undoubtedly correct. *See Greene*, 451 U.S. at 126 ("As a matter of constitutional law a city's power to adopt rules that will avoid anticipated traffic safety problems is the same as its power to correct those hazards that have been revealed by actual events."). "The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests." *United States v. Albertini*, 472 U.S. 675, 688, 105 S. Ct. 2897 (1985). Therefore, Plaintiff cannot successfully sustain an as-applied challenge merely because he personally was not impeding pedestrians at the time he was arrested.

to apply generally, but that the BPD or Officer Early adopted a practice of enforcing the Protocol only against circus or animal welfare demonstrators. Officer Early stated in his deposition that he knew that the Protocol applied to Plaintiff because of the content of his speech—specifically, because Ross's speech opposed the Circus's treatment of animals. According to Plaintiff, Officer Early was wearing a t-shirt expressing his love of deer hunting during Plaintiff's second arrest. While this does not indisputably establish that Officer Early took action against the demonstrators because of their differing views on animal welfare, his choice to wear such a shirt when he knew he would encounter animal welfare activists could be found by a jury to reflect animus towards their beliefs.[11]

Thus, I will deny summary judgment as to the as-applied challenge so that a factfinder may determine whether the Protocol, even if constitutional on its face, was discriminatorily enforced.

---

[11] Officer Early contends that he is entitled to qualified immunity as to the federal constitutional claims asserted against him. Qualified immunity shields government officials performing discretionary functions from liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). It protects officials who act "reasonably but mistakenly," *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987), regardless of whether they have made a mistake of law or mistake of fact, *Pearson v. Callahan*, --- U.S. ---, 129 S. Ct. 808, 815 (2009) (citations omitted). Because qualified immunity is an affirmative defense, the burden rests upon Officer Early to establish that it would not have been clear to a reasonable officer in his position that his conduct was unlawful. *See Franklin v. Clark*, 454 F. Supp. 2d 356, 361 (D. Md. 2006).

Here, it is well established that a content-neutral policy cannot be discriminatorily enforced. *See, e.g.*, *Cox*, 379 U.S. at 558 ("[A]ppropriate, limited discretion . . . concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is exercised with uniformity of method of treatment upon the facts of each application, free from . . . unfair discrimination . . . .") *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972) (reversing convictions for violations of government regulations occurring during demonstrations on government property because the regulations had been selectively applied); *Nieto v. Flatau*, 715 F. Supp. 2d 650, 656–57 (E.D.N.C. 2010) (holding that a regulation was unconstitutionally applied because, "although viewpoint neutral on its face, [it] has not been applied in a viewpoint-neutral manner"). Officer Early may nevertheless be entitled to immunity if he reasonably but mistakenly believed that the Protocol applied only to circus or animal welfare demonstrators, and he enforced it in conformity with this belief. The terms of the Protocol do not specify its scope, and the email subject "Circus Protesters" may have led him to conclude it applied only to those protesting the Circus or its treatment of animals. I will not dismiss the federal claims against Officer Early on the basis of qualified immunity, however, because he has not presented sufficient evidence regarding the information conveyed to him regarding the Protocol to show that a belief that it was targeted at circus or animal rights demonstrators was reasonable. In light of the evidence suggesting animus, a reasonable jury could conclude that Officer Early was aware the Protocol was content-neutral and generally applicable, but enforced it only against circus and animal welfare demonstrators.

V.

It follows from what I have said that Plaintiff's summary judgment motion must also be denied. It is for the jury to determine whether the Protocol was facially unconstitutional because it was targeted solely against circus and animal welfare protestors or, if not, whether it was discriminatorily enforced. If the jury's answers to both of these questions are "no," all of the Defendants are entitled to judgment in their favor.

December 8, 2010                              /s/
Date                                          J. Frederick Motz
                                              United States District Judge