IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AARON ROSS, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. JFM-09-3255 |
| | * | |
| WAYNE EARLY, *et al.*, | * | |
| Defendants. | * | |

******

MEMORANDUM

     This case stems from plaintiff Aaron Ross's ("Ross or plaintiff") arrests, in 2008 and 2009, for leafleting beyond the area designated for protest activities outside the First Mariner Arena ("the Arena").  The designated area, an outer portion of the sidewalk around the Arena demarcated by a brick border, was defined by a written protocol ("the Protocol") issued by defendant Linda Barclay ("Barclay"), the former Chief Solicitor for the City of Baltimore, as part of a joint policy between the Baltimore City Police Department ("BCPD") and the City Solicitor's office.  Ross claims the Protocol unconstitutionally restricts his First Amendment activity and names as defendants the Mayor and City Council of Baltimore ("the City"), BCPD, and several individuals associated with these offices (collectively "defendants").  Confining his expression to the designated area, he contends, violates the First Amendment on its face and as applied.  Ross also asserts claims for false arrest and false imprisonment against his arresting officer, Wayne Early ("Officer Early").

     On December 8, 2010, I issued an Opinion (1) denying defendants' joint motion[1] for summary judgment; (2) denying Ross's countermotion for summary judgment; and (3) denying,

---

[1] The joint motion was filed by defendants BCPD, the City, Officer Early, Barclay, Frederick H. Bealefeld, III, Baltimore City Police Commissioner, Elena DiPietro, Chief Solicitor for the Mayor and City Council of Baltimore, and George Nilson, City Solicitor for the Mayor and City Council of Baltimore.

without prejudice, Officer Early's motion for summary judgment. (ECF No. 44.) Defendants

subsequently moved for partial summary judgment based on qualified immunity (for individual

defendants Barclay, Bealefeld, III, Officer Early, DiPietro, and Nilson) and for reconsideration

of my December 8th ruling. (ECF No. 48.) On February 25, 2011, I denied reconsideration but

granted defendants' motion for qualified immunity except as to Officer Early. (ECF No. 53.)

Accordingly, judgment was entered in favor of defendants and against plaintiff as to Counts IV

and X of the Second Amended Complaint, both § 1983 claims filed against defendants in their

individual capacities. (ECF No. 54.)

At that point, both parties moved for certification for an interlocutory appeal, which I

granted on June 3, 2011. (ECF Nos. 60–61, 64.) The Fourth Circuit denied the petitions for

permission to appeal. (ECF No. 65.) Discovery thereafter resumed. Now pending are (1) BCPD

and the City's joint motion for summary judgment on Ross's § 1983 claims, Counts V and XI

(ECF No. 80); (2) Officer Early's motion for summary judgment[2] on all claims asserted against

him, Counts I–III and VI–IX (ECF No. 81); and (3) Ross's motion for reconsideration of my

December 8th ruling denying summary judgment (ECF No. 84). For the reasons articulated

below, BCPD and the City's motion will be denied, Officer Early's motion will be granted, and

Ross's motion will be denied.

## I. BACKGROUND

I described the factual background of this case in detail in my December 8, 2010

Opinion, *Ross v. Early*, 758 F. Supp. 2d 313 (D. Md. 2011), so I will provide only a brief

---

[2] Officer Early previously filed a motion for summary judgment on Ross's tort claims. (ECF No. 37.) At that time, I requested we focus first on the federal constitutional issues. Heeding my request, Ross did not provide a substantive response to Officer Early's motion. I therefore denied Early's motion, (ECF No. 45), without prejudice to file a renewed motion, which he has now done.

recitation of the relevant facts.  Prior to 2004, there were no restrictions on protest activities or demonstrations outside the Arena.  In 2003, a truck used by animal welfare demonstrators[3] to protest the Ringling Brothers Barnum and Bailey Circus ("the Circus") caused a traffic problem outside the Arena, endangering nearby drivers and pedestrians.  In 2004, in response to the 2003 truck incident,[4] a member of the City Solicitor's office, at the request of Officer Wayne Early ("Officer Early") and other Baltimore City Police Department ("BCPD") officers, drafted the Protocol,[5] a policy restricting demonstrators to designated portions of the Arena's perimeter.  *See Ross*, 758 F. Supp. 2d at 317 (laying out the Protocol's restrictions).  The 2004 Protocol was disseminated and implemented prior to, and during, all Circus performances in subsequent years.[6]

---

[3] As I noted in the December 8, 2010 Opinion, I use the term "demonstrators" to refer to both those engaged in protest activities, such as chanting and picketing, and those engaged in leafleting, but I note that these activities are distinct.

[4] Although the basis for the Protocol seemed to me to be an uncontested point, Ross now questions the veracity of defendants' assertion that the Protocol originated solely, or at least in large part, as a reaction to the 2003 truck incident.  (Ross Cross-Mot. Recons. & Summ. J. 7–9.) Ross argues that although the defendants assert the Protocol was "in response to the significant disruption of public safety [caused by the demonstration truck] on March 12, 2003, on the sidewalks and roadways surrounding the Arena," (Def. Opp. Summ. J. at 6, ECF No. 40), it seems the Protocol's origins predate the truck incident.  To support this assertion, Ross points to an email mentioning a discussion between Officer Early and BCPD Acting Chief Legal Counsel Peter Saar concerning the proper way to handle Circus demonstrators outside the Arena.  (Ross Cross-Mot. Recons. & Summ. J. Ex. 23).  The truck incident occurred on March 12, 2003 and the discussion mentioned in the email occurred on March 13, 2003.  Thus, conceivably the discussion could have been in response to the truck incident.  The email is therefore not probative and there is no other factual support for Ross's claim that defendants' proffered basis for the Protocol is invented.

[5] I have already disposed of defendants' argument that the protocol constituted only "legal advice," which would shield them from § 1983 liability.  To the contrary, I held the protocol was a clear, municipal policy.  *See Ross*, 758 F. Supp. 2d at 317 n.3.

[6] Only minor changes were made to the Protocol over the years, (Ross Cross-Mot. Recons. & Summ. J. Ex. 18–22, ECF No. 83), none of which are relevant to the activities in the present case.

Plaintiff, Aaron Ross ("Ross"), was arrested in 2008 and again in 2009 by Officer Early for failing to heed an order to stop leafleting in the fifteen feet of sidewalk closest to the Arena, outside the Protocol's designated area.  Ross thereafter filed an 11-count complaint against BCPD, the City of Baltimore ("the City"), Officer Early, and individuals from the City Solicitor's office.  The majority of the counts remain.[7]  Ross asserts state law claims against Officer Early, including, based on the 2008 arrest for false arrest (Count I); a violation of Article 26 of Maryland's Declaration of Rights (Count II); and based on the 2009 arrest, for false arrest (Count IV); false imprisonment for post-arrest detention (Count VII) and violation of Article 26 of Maryland's Declaration of Rights (Count VIII).  Ross also asserts claims pursuant to 42 U.S.C. § 1983 against Officer Early, in his individual capacity, for the 2008 and 2009 arrests (Counts III and IX, respectively), and against the City and BCPD for violating his rights under the First and Fourth Amendments (Counts V and XI).   The three motions pending before me relate to these remaining counts.  For the following reasons, BCPD and the City's motion for summary judgment is denied, Officer Early's motion for summary judgment is granted, and Ross's motion for reconsideration is denied.  Counts V and XI will proceed to trial.

## II.  STANDARDS OF REVIEW

### A.  Summary Judgment

A court may properly award summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  A material fact is one that "might affect the outcome of the suit."  *Anderson v.*

_____

[7] Counts IV and X, § 1983 claims against city and police officials in their individual capacities, have been dismissed. (ECF No. 54.)

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*  When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn therefrom in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 373, 378 (2007).

While the burden is on the moving party to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), "[a] mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  The non-moving party may not merely rest upon allegations or denials in her pleadings but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial.  Fed. R. Civ. P. 56(e)(2).  A court should enter summary judgment where a non-moving party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S at 247–48.

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted.  *See id.* at 248.  The District of Maryland has held that "a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001).  Summary judgment is inappropriate, however, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they

may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *see JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

B.  Motion for Reconsideration

Federal Rule of Civil Procedure 59(e) permits the district court to reconsider a decision in certain circumstances.  Fed. R. Civ. P. 56(e).  "There are three situations in which a district court may amend an earlier judgment: '(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.'"  *McLaughlin v. Murphy*, 372 F. Supp. 2d 465, 476 (D. Md. 2004) (quoting *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002)).  However "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."  *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (quoting 11 Charles Alan Wright, et al., *Federal Practice and Procedure* § 2801.1 (2d ed. 1995)).

III. ANALYSIS

A.  BCPD and the City's Motion for Summary Judgment

The City and BCPD move for summary judgment on Counts V and XI, § 1983 claims against the municipal defendants for the allegedly unconstitutional Protocol underlying Ross's 2008 and 2009 arrests.  Defendants previously moved for summary judgment on these counts, arguing that the Protocol constituted a reasonable time, place, and manner restriction, and therefore was not unconstitutional.  I concluded that the Protocol was content-neutral, served a significant government interest, and provided sufficient alternative avenues of communication. *Ross*, 758 F. Supp. 2d at 320–25; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (listing the requirements for a reasonable time, place, and manner restriction).  I declined

to grant summary judgment, however, because I determined that there remained a genuine

dispute of fact regarding the Protocol's tailoring. *Ross*, 758 F. Supp. 2d at 326–27; *see Ovadal v.

City of Madison*, 416 F.3d 531, 537–38 (7th Cir. 2005) (noting that deciding whether a

restriction is narrowly tailored, in addition to the other elements of a time, place, and manner

analysis, requires that there be no subsidiary questions of fact). I declined reconsideration for the

same reason, *Ross*, 758 F. Supp. 2d 328–30, and will likewise deny the pending motion.[8]

    In my December 8th Opinion I distinguished between two standards for narrow tailoring:

an intermediate standard for generally applicable ordinances and regulations, and a heightened

standard the Supreme Court has articulated for injunctions.[9] *Id*. at 323 (comparing *Ward*, 491

---

[8] As noted in the December 8th Opinion, I declined to grant summary judgment on Ross's as-applied challenge for the same reason—existence of a material factual dispute. *See Independence News v. City of Charlotte*, 568 F.3d 148, 155 (4th Cir. 2009) (applying the same time, place, and manner legal analysis "regardless of whether [the] challenge is styled as facial or as-applied"). However, Ross in essence conceded there is no evidence to support an "as applied" claim. (Ross Cross-Mot. Reconsid. & Summ. J. at 34 (acknowledging that if found to be constitutional on its face, he could not prove the Protocol was discriminatorily enforced as he has no direct evidence of non-enforcement against other protestors). Thus, the court will focus exclusively on the facial challenge from this point forward.

[9] I discussed at length my reasoning for employing this two-standard analysis and the importance of distinguishing between general ordinances and injunction-like restrictions. *See Ross*, 758 F. Supp. 2d at 323–25. I will only briefly repeat myself here. Although the Fourth Circuit has never acknowledged application of *Madsen*'s heightened tailoring standard to restrictions other than court-imposed injunctions, the Second and Third Circuits have applied the *Madsen* standard to non-statutory "injunction-like" restrictions. *See McTernan v. City of York*, 564 F.3d 636, 654–55 (3d Cir. 2009), *Huminski v. Corsones*, 386 F.3d 116, 155 (2d Cir. 2004). I find these cases persuasive and agree that heightened scrutiny should apply to restrictions possessing characteristics of an injunction, characteristics that the Supreme Court identified as warranting more searching review. *Madsen*, 512 U.S. at 764–65 (noting injunctions (1) are not the product of "deliberative, democratic decisionmaking," (2) can target specific groups and therefore "carry greater risk of censorship and discriminatory application than do general ordinances," and (3) are crafted in response to prior violations and therefore "can be tailored . . . to afford more precise relief"). Thus, to the extent a restriction on speech possesses characteristics similar to an injunction, the heightened standard articulated in *Madsen* should apply, as the same interests and concerns are involved. *See Madsen*, 512 U.S. at 765 (discussing concerns with the targeted nature of an injunction and emphasizing that the restrictions be "no more burdensome . . . than necessary") (internal citations omitted). In this case, the fact that the Protocol is not a court-

U.S. at 797–800 (standard for a generally applicable ordinance) with *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (standard for an injunction)).  For purposes of intermediate scrutiny, a time, place, and manner restriction on speech is narrowly tailored "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Ward*, 491 U.S. at 799 (citing *United States v. Albertini*, 472 U.S. 675, 689 (1985)).  The regulation need not represent the least restrictive means of achieving the government's stated purpose.  Heightened scrutiny, by contrast, requires proof that the regulation is the least restrictive means, that is to say, it burdens no more speech than necessary to serve the government's interest.  *Madsen*, 512 U.S. at 765.  Following the reasoning of the Second and Third Circuits—courts that have applied the heightened standard to "injunction-like" restrictions on speech—I held that if the jury determines the Protocol is targeted toward animal welfare demonstrators specifically, it is more analogous to an injunction than a statute of general application, and failing to be sufficiently tailored under heightened scrutiny, would be struck down as unconstitutional.  *Ross*, 758 F. Supp. 2d at 323–24; *see McTernan*, 564 F.3d at 654 (applying *Madsen*'s heightened scrutiny to a police directive because the court determined the directive posed risks similar to those presented by an injunction).  If, however, a jury determines the Protocol is generally applicable, the more lenient standard would apply, and the Protocol would be upheld.  *Id*.  A reasonable jury could conclude either way; the record contains conflicting evidence.  *Ross*, 758 F. Supp. 2d at 318 (discussing evidence on both sides); *see* Video of 2008 Arrest, Ross Cross-Mot. Recons. & Summ. J. Ex. 15 (showing police officers—

---

issued injunction but rather a policy adopted by the Baltimore City Law Department does not preclude heightened scrutiny since the policy possesses characteristics akin to an injunction, particularly if a jury determines the restrictions only applied to circus and animal welfare demonstrators. *See Ross*, 758 F. Supp. 2d at 324 (identifying characteristics of the Protocol that are similar to an injunction).

cognizant of being videotaped— requesting that, what appear to be religious demonstrators, move their activities to the Protocol's designated area); Officer Early Interrog. Answer No. 6, BCPD & City Mot. Summ. J. Ex. 19; Dep. of Wayne Early ("Early Dep.") 29:11–18; 31:6–13; 58:12–17, Ross Cross-Mot. Recons. & Summ. J. Ex. 25; Dep. of Robin Nicole Helfritch ("Helfritch Dep.") 47:10–16; 49:19–16, BCPD & City Mot. Summ. J. Ex. 2; Aff. of Robin Helfritch ("Helfritch Aff.") ¶¶ 2, 5–8, Ross Cross-Mot. Recons. & Summ. J. Ex. 11; 2004, 2005, 2006, 2007, and 2009 Protestors at Circus-Protocol Emails, Ross Cross-Mot. Recon. & Summ. J. Exs. 18–22; Dep. of Linda Barclay ("Barclay Dep.") 92:6–10; 135:6–19, Ross Cross-Mot. Recons. & Summ. J. Ex. 24; Dep. of Wayne Early ("Early Dep.") 28:1–15, Ross Cross-Mot. Recons. & Summ. J. Ex. 25; Aff. of Erin Marcus ("Marcus Aff.") ¶¶ 6–7, 23–24, Ross Cross-Mot. Recons. & Summ. J. Ex. 28.  Whether the police allowed leafletters, vendors, and other demonstrators in the restricted areas while confining Circus demonstrators to the designated areas is a decisive, and fervently disputed, fact.  The fact that the Protocol, on its face, appears generally applicable is not determinative.  *See McTernan*, 564 F.3d at 648 (discussing how facial applicability is not conclusive of whether a restriction is generally applicable because "a regulation facially applicable to all persons is not 'generally applicable' if it is enforced against a [particular] category of [persons or conduct].").  It is also unclear whether the Protocol was enforced at all during non-Circus events.

Defendants contend that the dispute as to whether the Protocol was generally applicable or injunction-like need not preclude summary judgment because, they conclude, the Protocol passes muster under either heightened or intermediate scrutiny.  I disagree.  I stated in the December 8th Opinion, and reaffirm here, that the Protocol would fail if found to be injunction-like and subjected to heightened scrutiny.  Burdening no more speech than necessary, the

tailoring standard for heightened scrutiny, requires that the restriction focus *only on past disruptive conduct* that might be reasonably be anticipated to re-occur.  This is in contrast to intermediate scrutiny, which does not require a regulation to utilize the least restrictive means to be narrowly tailored and therefore allows restrictions in response to past disruptive conduct *and anticipated* problems of a similar nature.  *Compare City of Memphis v. Greene*, 451 U.S. 100, 126 (1981) ("As a matter of constitutional law a city's power to adopt [general] rules that will avoid anticipated traffic safety problems is the same as its power to correct those hazards that have been revealed by actual events") *with Madsen*, 512 U.S. at 765 ("[Injunctions] can be tailored . . . to afford more precise relief than a statute where a violation of the law has already occurred.")

The Protocol was implemented, at least in large part, in response to a 2003 incident caused by a demonstration vehicle.  There is a clear disconnect between the purported basis for the Protocol's promulgation, a vehicular incident, [10] and the subject of the Protocol's restrictions, sidewalk-based pedestrian activities.  Because the only demonstrated safety issue before the Protocol's passage was caused by a demonstration vehicle, the Protocol cannot reasonably be found to burden no more speech than necessary because it specifically affects pedestrians and sidewalk-based expressive activities, not motorists or the use of demonstration vehicles, and

---

[10] Defendants now seem to stress that the Protocol was in response to "a police officer's question, what lawful actions could an officer take to maintain public safety on the sidewalk." (BCPD & the City's Resp. at 1, ECF No. 87).  This shift appears to be at least somewhat in response to my belief that the Protocol would fall under heightened scrutiny because the Protocol's restrictions on sidewalk activities are completely disconnected from the 2003 vehicular incident allegedly spurring the Protocol's promulgation.  However, even if I were to accept this new argument, which, strangely, Ross also discusses indirectly, *see supra* footnote 4, the fact still remains that no defendant or witness produced by the defendants can identify concrete examples of pedestrian issues prompting the need for the Protocol's sidewalk restrictions.  A mere suggestion of potential pedestrian safety issues, crowd control concerns, or an over-exaggerated recounting of the impact of past animal welfare demonstrators are insufficient to pass heightened scrutiny.

forces all Circus demonstrators to remain in a prescribed area. If held to be injunction-like, therefore, the Protocol would be struck down for insufficient tailoring.

Although restrictions on pedestrian demonstrators have been held to meet the "no broader than necessary" standard in other cases, those cases involved specific evidence of past problems caused by pedestrian demonstrators, such as violence, the disruption of medical services or severe impediments to pedestrian traffic. *See Schenck v. Pro–Choice Network of W.N.Y.*, 519 U.S. 357, 362–64 (1997); *Madsen*, 512 U.S. at 758–59; *Frantz v. Gress*, 359 F. App'x 301, 302–04 (3d Cir. 2009). The evidence here is distinguishable from these cases and cannot similarly justify the broad restriction on pedestrian demonstrations the Protocol imposes.

BCPD and the City argue that this court's reasoning is based on a flawed premise. They assert that time, place, and manner restrictions may be based on potential conduct, not solely past conduct. Applied to the present case, defendants contend the Protocol was properly addressing potential pedestrian safety concerns, not implemented solely as a response to a past vehicular incident. Defendants rely principally on *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), for the proposition that courts can uphold time, place, and manner restrictions without evidence of past conduct necessitating the restrictions. (Defs.' Mot. Summ. J. at 9.) Defendants are not wholly incorrect. For generally applicable time, place, and manner restrictions, like the restriction in *Clark*,[11] potential disruptive conduct—if at least similar to past conduct—can serve as the basis of a properly tailored restriction. But, targeted and narrowly focused time, place, and manner restrictions more akin to an injunction must be based on past, demonstrated conduct. *Madsen*, 512 at 762 ("An injunction, by its very nature, applies only to a particular group (or individuals) . . . [based on] the group's past actions in the context of a

---

[11] *Clark* involved a generally applicable ban on camping in certain national parks, which prevented plaintiff's 24-hour demonstration.

specific dispute between real parties.")  The reasoning is self-evident.  There is far too much room for potential abuse if injunction-like restrictions could be premised on any conceivable or articulable future harm.  There must be some predicate activity spurring a need for targeted, restrictive policies.  This goes to the underlying rationale for subjecting injunctions to heightened scrutiny.  *See id*. at 764.  Basic principles of equity dictate that an injunction be issued only "if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a cognizable danger of recurrent violation."  *Madsen*, 512 U.S. at 766 n.3.  Injunctions are not proactive; they are reactive.  Imposing a targeted restriction without a basis in prior conduct is inequitable.  There must be some basis in prior conduct to warrant the injunction's selectivity.  The same goes for injunction-like restrictions.  Here, then, if the Protocol is found to be injunction-like, applying only to Circus and animal welfare demonstrators, the restriction is not narrowly tailored because of the absence of a prior history of pedestrian traffic and/or safety concerns.

To counter, defendants point to the District Court for the District of Columbia's ruling in *Defending Animal Rights Today and Tomorrow (DARTT) v. Washington Sports and Entertainment, LP*, 821 F. Supp. 2d 97 (D.D.C. 2011), upholding a restriction similar to the one here.  In *DARTT*, animal welfare leafleters protesting the Circus at the Verizon Center in the District of Columbia were moved to a designated area out of concern for pedestrian safety.  The District Court for the District of Columbia held that the restriction was narrowly tailored under both intermediate scrutiny and *Madsen*'s heightened scrutiny.  *Id*. at 105 n.3.  *DARTT* can be easily distinguished from the present case, however.  The restrictions placed on the DARTT individuals were the product of a contemporaneous reading of the situation and a decision by Verizon Center employees, security guards, and an off-duty Metropolitan Police officer that the

current activities were hazardous to pedestrians.  *Id*. at 100–02.  DARTT demonstrators were moved 20 feet away from the door during a mass exit from the arena.  They were not subjected to a formal, written policy restricting them to a prescribed demonstration area for the duration of the Circus.  Thus, *DARTT* did not involve enforcement of a written policy or directive aimed at potential or future pedestrian safety risks. [12] I should also note that the *DARTT* court seems to confound the narrowly tailored element with the alternative channels elements and therefore does not provide a clear and focused tailoring analysis.  *Id*. at 107 (discussing, under the narrow tailoring analysis rather than the more proper alternative channels analysis, the impact the move had on the protestor's interaction with their prospective audience).

Defendants also stress that pedestrian safety is a significant government interest.  (Mot. Summ. J. 9–10.)  I do not quarrel with this proposition.  *Ross*, 758 F. Supp. 2d at 322.  What is at issue is whether the Protocol was narrowly tailored to achieve that interest.  Thus, even though I acknowledge pedestrian safety as a significant government interest, if the Protocol is found to be akin to an injunction, without a history of pedestrian traffic problems, or safety concerns, restricting sidewalk demonstrators to a designated area is overly burdensome.  In other words, ensuring pedestrian safety is a significant interest and I understand that leafleting in the middle of the sidewalk can be risky or potentially harmful.  It is my view that a policy restricting the activities of circus and animal welfare street demonstrators specifically—should a jury so determine is the case here—is overly burdensome without evidence of prior pedestrian safety issues.

In sum, the Protocol's constitutionality rests on the applicable level of scrutiny, which,

---

[12] I should also note that the *DARTT* court seems to confound the narrowly tailored element with the alternative channels elements and therefore does not provide a clear tailoring analysis.  *Id*. at 107 (discussing, under the narrow tailoring analysis rather than the alternative channels analysis, the impact the move had on the protestors' interaction with their prospective audience).

depends on the Protocol's scope, a factual determination to be answered by the jury, not by the court on summary judgment. This conclusion is undisturbed by defendants' briefing in the pending motion. BCPD and the City present no new evidence that would lead me to depart from my earlier denial of summary judgment, nor do they reference controlling law that calls into question my First Amendment analysis resulting in the dispositive factual determination precluding summary judgment. BCPD and the City's motion for summary judgment is therefore denied.

B. Officer Early's Motion for Summary Judgment

Officer Early seeks summary judgment on the common law and constitutional tort claims asserted against him. Ross asserts § 1983 claims against Officer Early, claiming the 2008 and 2009 arrests violated Ross's First and Fourth Amendment rights. Ross also asserts the following state claims against Officer Early: first, based on the 2008 arrest, for false arrest (Count I), and for violation of Article 26 of the Maryland Constitution's Declaration of Rights (Count II); second, based on the 2009 arrest, for false arrest (Count VI); false imprisonment based on Ross's post-arrest detention (Count VII) and violation of Article 26 of the Maryland Constitution's Declaration of Rights (Count VIII). For the reasons that follow, Officer Early's motion for summary judgment will be granted. I find that Officer Early is entitled to qualified immunity and is therefore immune from § 1983 liability. In terms of the state claims, looking at the facts in the light most favorable to Ross, I find there is insufficient evidence for a reasonable jury to find for Ross, and Officer Early is entitled to judgment as a matter of law.

i. Federal Constitutional Claims

Ross asserts a claim against Officer Early under 42 U.S.C. § 1983 for violating his First and Fourth (extended by the Fourteenth) Amendment Rights. Officer Early avers that he is

14

entitled to qualified immunity.  For the following reasons, I find Officer Early is entitled to

qualified immunity[13] and grant summary judgment in his favor.  Ross's § 1983 claims against

Officer Early are therefore dismissed.

A plaintiff prevails on a § 1983 claim if he can demonstrate (1) the defendant deprived

him of a right secured by the Constitution or the laws of the United States, and (2) the

deprivation was achieved by the defendants acting under color of state law.  *Paul v. Davis*, 424

U.S. 693, 696–97 (1976).  Qualified immunity, however, shields government officials, including

police officers, *see Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006); *Mensh v. Dyer*, 956 F.2d

36, 39 (4th Cir. 1991), performing discretionary functions from civil damages pursuant to § 1983

as long as "their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

It protects officials who act "reasonably but mistakenly," *Anderson v. Creighton,* 483 U.S. 635,

641 (1987), regardless of whether they have made a mistake of law or mistake of fact.  *Pearson*

*v. Callahan,* 555 U.S. 223, 231 (2009); *see Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[T]he

qualified immunity defense . . . provides ample protection to all but the plainly incompetent or

those who knowingly violate the law."); *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (stating

that qualified immunity ensures "[o]fficials are not liable for bad guesses in gray areas; [but

---

[13] This court can afford qualified immunity despite the fact that it has yet to be determined
whether a constitutional violation occurred.  Determination of a violation of constitutional rights
is no longer a predicate for assessing qualified immunity; a court may first address whether the
right allegedly violated was clearly established at the time of the violation before determining
whether the violation actually occurred.  *See Swagler v. Sheridan*, 837 F. Supp. 2d 509, 535 (D.
Md. 2011) ("The judges of the district courts and courts of appeals should be permitted to
exercise their sound discretion in deciding which of the two prongs [(1) violation of an
individual's constitutionally protected right and (2) that the right was clearly established at the
time of the alleged violation] of the qualified immunity analysis should be addressed first in light
of the circumstances in the particular case at hand.") (citing *Pearson v. Callahan,* 555 U.S. 223
(2009)).

only] for transgressing bright lines").

Officer Early is therefore immune from Ross's § 1983 claims unless "it appears that (1) [he] violated a statutory or constitutional right of the plaintiff, and (2) the right was clearly established at the time of the acts complained of such that an objectively reasonable official in [his] position would have known of the right." *McVey v. Stacy*, 157 F.3d 271, 276 (4th Cir. 1998) (internal quotations and citations omitted). Both prongs must be present to defeat a motion for summary judgment based on qualified immunity. *Batten v. Gomez*, 324 F.3d 288, 293–94 (4th Cir. 2003). Thus, if the right was not clearly established, for example, Officer Early would be entitled to qualified immunity without an assessment of the first prong.

To determine whether a right was clearly established at the time of the alleged infringement courts look at "controlling authority in the jurisdiction in question or on a 'consensus of cases of persuasive authority.'" *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Because qualified immunity is an affirmative defense, *Harlow*, 457 U.S. at 815 (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)), the burden rests upon Officer Early to establish that it would not have been clear to a reasonable officer in his position that his conduct was unlawful. *See Franklin v. Clark,* 454 F. Supp. 2d 356, 361 (D. Md. 2006).   We must look then at the relevant "legal rules that were 'clearly established' at the time" with respect to Ross's First and Fourth Amendment claims.

As a preliminary matter, it is important that I carefully articulate the focus of my inquiry. I am probing into the existence of "clearly established" First and Fourth Amendment rights that Officer Early allegedly violated when he arrested Ross for failing to obey his order, an order aimed at enforcing the City's Protocol.  I do not accept that Officer Early, as he asserts, arrested Ross for failing to obey an order based solely on a present-moment assessment of what was

necessary to ensure public safety.  (Early Dep. 30:11–20; 33:17–34:6; 35:8–17.)  The record

simply does not support this assertion.  If that were in fact the case, qualified immunity would be

granted without much assessment as such an arrest would not violate Ross's constitutional rights.

It seems, however, that the Protocol formed the basis for Officer Early's order. [14]  Despite

Officer Early's statement of probable cause for both arrests— asserting Ross was blocking the

entrance to the arena (Statement of Probable Cause for 2008 and 2009 Arrests, Ross Cross-Mot.

Recons. & Summ. J. Exs. 31 & 32)—video of the arrests proves otherwise.  (Video of 2008 and

2009 Arrests, Ross Cross-Mot. Recons. & Summ. J. Exs. 12 & 15;  Aff. of Aaron Ross ("Ross

Aff.") ¶ 2, Ross. Cross-Mot. Recons. & Summ. J Ex. 13).  The video shows Ross was in no way

blocking or impeding the free flow of patrons attempting to enter or exit the building.  In fact,

Ross was a considerable distance from the entrance, far from "standing in front of the entrance

doors," as the statement of probable cause reads.  (Video of 2008 and 2009 Arrests, Ross Cross-

Mot. Recons. & Summ. J. Exs. 12 & 15).  Further, at one point Ross is simply told "red brick," a

reference to the bricked outer portion of the sidewalk, the Protocol's designated area for

demonstrations.  Finally, Officer Early's interaction with Ross is consistent with the Protocols

instructions. (*See* 2004, 2005, 2006, 2007, and 2009 Protestors at Circus-Protocol Emails, Ross

Cross-Mot. Recons. & Summ. J. Exs. 18–22 ("The officers will issue at least 2 verbal warnings

prior to making any arrest for failure to obey a lawful order or otherwise.")).  Overall, the record

strongly suggests that Officer Early ordered Ross to move the his leafleting activity based on an

attempt to enforce the Protocol.  Faced with Ross's refusal, Officer Early placed Ross under

arrest for failure to obey a lawful order.  His conduct was reasonable.  It would not have been

---

[14] Although the Protocol speaks only of "protesters" generally, the word was meant to include
leafleters and was clearly applied by Officer Early in this instance.  (Barclay Dep. 15:18–16:1;
23:17–19; 113:6–9; Early Dep. 28:1–3).

clear to a reasonable officer in Early's position that arresting Ross for failing to obey an order aimed at enforcing the Protocol was unlawful.

With respect to the alleged First Amendment violation, as I noted earlier in this opinion, this case involved a challenging First Amendment analysis, particularly since the First Amendment standard hinges on a question of fact for the jury.  The Fourth Circuit does not mandate the application of the heightened standard in the present action, and the  Second and Third Circuit cases I have found to be persuasive do not establish such a clear consensus that a reasonable person would have known that the Protocol was unconstitutional.  Even if the Protocol is ultimately held unconstitutional, it clearly falls in the constitutional "gray area," and qualified immunity protects decisions made under such unclear circumstances.

Thus, irrespective of whether the Protocol is constitutional, which remains to be determined, Officer Early's conduct was reasonable.  There is every indication Ross followed what he believed to be a valid Protocol dictating restrictions on protest activities during the Circus.  There is nothing to indicate that Officer Early had reason to know or suspect that the Protocol was unconstitutional or that enforcing the Protocol's restrictions infringed on Ross's clearly established rights.

Ross points to the chronology of events to suggest otherwise.  Ross highlights the fact that Officer Early and other police officers raised concerns about demonstrators at the Circus in 2003, before the truck incident that defendants claim precipitated the Protocol's promulgation.[15] (Ross Cross-Mot. Recons. & Summ. J. 6–9.)  In response, BCPD Acting Chief Legal Counsel

---

[15] To ensure that I'm not seen as contradicting my earlier assertions in section A that the truck incident was the only concrete example of past safety issues, the pedestrian safety concerns raised by Officer Early were primarily about control of the large Circus crowds, not demonstrators, obstructing the sidewalk, and second, with respect to any concerns raised about demonstrators, the claims were hypothetical and vague.  (Barclay Dep. 57–68.)

"advised [Mr. Early] that the entire sidewalk area was free to be used by the protestors to approach people and offer literature." (Ross Cross-Mot. Recons. & Summ. J. Ex. 23.)   Then, in 2004, the Protocol was put into place.  Contrary to Ross's assertions, however, this chronology does not imply that Officer Early knew the Protocol was unconstitutional or had reason to suspect it was unconstitutional because earlier attempts to restrict demonstrator activity were thwarted.  To the contrary, it implies the opposite.  In 2003, Officer Early inquired about potential action to be taken to ensure pedestrian safety and ease ingress and egress to the Arena and was told, authoritatively, that the sidewalks should remain free for all First Amendment activities.  Then, in 2004, the Protocol was formally implemented.  This clear reversal conveys faith and confidence in the constitutionality of the Protocol, and there is every reason for Officer Early to think the Protocol was valid.

With respect to the alleged Fourth Amendment violation, it is uncontested that Ross failed to obey Officer Early's order, and because the underlying basis for the order was what Officer Early believed to be a constitutionally valid Protocol, the arrest did not violate Ross's clearly established Fourth Amendment rights.  Thus, Officer Early is entitled to qualified immunity.

Going a step further, however, Officer Early has demonstrated probable cause sufficient to vitiate any claim of § 1983 liability.  The Fourth Circuit has stated that "[w]hether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir. 1992).  While the qualified immunity and probable cause inquiries are related, defendants must make a greater showing to demonstrate probable cause.  *See Torchinsky v. Siwinski,* 942 F.2d 257, 261 (4th Cir. 1991) ("the standard for

probable cause . . . is more stringent than is the requirement for qualified immunity"). The record reflects that Officer Early had more than probable cause to arrest Ross for failing to obey a lawful order based on the City's Protocol. Officer Early ordered Ross to move the location of his leafleting activity, and when faced with Ross's reluctance firsthand, placed Ross under arrest for failing to obey a lawful order. He therefore had probable cause to arrest Ross for failure to heed what Officer Early reasonably believed was a constitutionally valid Protocol. A finding of probable cause eliminates Ross's § 1983 claim based on the Fourth Amendment because "there is no cause of action for 'false arrest' under Section 1983 unless the arresting officer lacked probable cause." *Claiborne v. Cahalen*, 636 F. Supp. 1271, 1277 (D. Md. 1986) (citing *Street v. Surdyka,* 492 F.2d 368, 372–73 (4th Cir.1974)).

Officer Early is entitled to immunity even if he mistakenly believed the Protocol applied only to Circus or animal welfare demonstrators because that belief would have been reasonable.[16] The terms of the Protocol do not specify its scope, and the email subject "Circus Protestors" may have led Early to conclude it applied only to those protesting the Circus or its treatment of animals. Barclay, who drafted the Protocol, admitted that the Protocol uses the term "circus protestors" exclusively, and she "thought" the police would understand that it applied to all individuals protesting during the Circus, regardless of subject-matter. (Barclay Dep. 136:6–19.) Officer Early's personal feelings toward animal welfare demonstrators is also irrelevant for the purposes of qualified immunity. Qualified immunity "turns on the objective legal reasonableness of the action." *Anderson*, 483 U.S. at 639 (internal quotationx and citationx

---

[16] There is nothing to suggest that Officer Early, aware that the Protocol was content-neutral and generally applicable, purposely targeted Ross because he was protesting the Circus. Neither Ross nor fellow leafletter Helfritch could identify non-animal welfare demonstrators against whom the police did not enforce the sidewalk regulation. Officer Early emphasized the arrest had nothing to do with the type of literature Ross was handing out. (Early Dep. 13: 1–7; 40: 19–21.)

omitted).  It is not a subjective assessment.  *See Harlow*, 457 U.S. at 817–18 (finding that placing on officials the burden of proving lack of malice to obtain qualified immunity at the summary judgment phase was excessive).

    ii. State law claims

        a. False Arrest and False Imprisonment

    Because the torts of false arrest and false imprisonment "share the same elements" in Maryland, *Okwa v. Harper*, 757 A.2d 118, 133–34 (Md. 2000), I will discuss them together. Both torts require a plaintiff to prove he was deprived of his liberty without his consent and without legal justification.  *Id.*; *see Herrington v. Red Run Corp.*, 811 A.2d 894, 896 (Md. Ct. Spec. App. 2002).  The arrests constitute a deprivation of Ross's liberty.  *State v. Dett*, 891 A.2d 1113, 1121 (Md. 2006) (stating that the act of arrest itself constitutes a deprivation of liberty for purposes of evaluation a false arrest/false imprisonment claim).  The issue, then, on summary judgment is whether there was legal justification for the arrests and subsequent post-arrest detention.  *See Okwa*, 757 A.2d at 134.  Courts equate legal justification with legal authority and look to the principles applicable to the law of arrest to determine whether the alleged deprivation was justified.[17]  *Ashton v. Brown*, 660 A.2d 447, 472 (Md. 1995) (citing *Great Atl. & Pac. Tea Co. v. Paul*, 261 A.2d 731, 738 (Md. 1970)).  In the context of a warrantless arrest for a non-felony offense, as was the case here, Maryland courts have held that "a police officer is legally justified only to the extent that a misdemeanor was *actually committed* in a police officer's view or presence . . . probable cause is not a defense."  *Id*. at 472; *see* Md. Code Ann., Crim. Proc.,

---

[17] Legal justification must not be conflated with probable cause.  "[T]he actual element of the tort of false imprisonment is legal justification rather than probable cause."  *Ashton*, 660 A.2d at 472.

§ 2-202 (granting authority to make an arrest without a warrant if police officer witnesses a misdemeanor or felony being committed in his presence).

To determine if an officer had legal authority to make a warrantless arrest for a non-felony, the court must ask if, in the light most favorable to the plaintiff, a fact-finder could infer the plaintiff was not committing the charged crime. *See Okwa*, 757 A.2d at 134. On March 12, 2008 and again on March 24, 2009, Officer Early arrested Ross for failure to obey a lawful order.[18] (Early Dep. 9:21–22, BCPD & the City Mot. Summ. J.[19] Ex. 1; Early Answer Interrog. 7, BCPD & the City Mot. Summ. J. Ex. 19; *see* Md. Code Ann., Crim. Law § 10-201(c)(1) & (3) (making it a misdemeanor for a person to "willfully and without lawful purpose obstruct or hinder the free passage of another in a public place or on a public conveyance" or "willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace"). A reasonable fact-finder could not find or infer that Ross obeyed Officer Early's order. The evidence clearly establishes that on both occasions Ross did not heed Officer Early's repeated requests to move his leafleting activity. (Early Answer Interrog. 7, BCPD & the City Mot. Summ. J. Ex. 19; Early Dep. 11:11-14; 12:6–15; 37:20–7; 40:18–19; 57:20–22, BCPD & the City Mot. Summ. J. Ex. 1; Dep. of Aaron Ross ("Ross Dep.") 34:18–35:4; 42:4–17; 47:4–10; 84:12–20; 887:22–88:7; 134:3–18, BCPD & City Mot. Summ. J. Ex. 4.) After the several requests were made and ignored, Officer Early warned of impending

---

[18] As discussed *supra* section B.i., Ross was not arrested for "violating the Protocol" per se but rather for failing to obey Officer Early's order to move his leafleting activities elsewhere. (Early Dep. 30:11–20; 33:17–34:6; 35:8–17.) This is immaterial to the court's false arrest/false imprisonment analysis. Even if the arrest was found to be based solely on the Protocol, and the Protocol was later found to be invalid, it would be of no legal consequence. *Ashton*, 660 A.2d at 473 (noting that a police officer's arrest pursuant to an ordinance could still be with lawful justification even though the underlying ordinance was invalid).

[19] Defendant Early adopted and incorporated the exhibits used by BCPD and the City in their motion for summary judgment. (Early Mot. Summ. J. at 4 n.1, ECF No. 81.)

arrest and gave Ross one last opportunity to follow the order before he was ultimately arrested

for failure to obey Early's order.  (Early Dep. 41:6–11).  As articulated above, an officer has

legal justification to arrest an individual if he witnesses that individual commit a crime in his

presence.  Thus, Ross's false arrest claim fails.

Ross's false imprisonment claim also fails.  Ross's false imprisonment claim focuses on

post-arrest detention subsequent to Ross's 2009 arrest.  Ross alleges that after his 2009 arrest,

Officer Early took him to a police station rather than Central Booking, refused to permit him to

use the restroom, threatened to have him held for thirty days, and abandoned him at the station.

(Ross Aff. ¶¶ 11–13, Ross Cross-Mot. Recons. & Summ. J. Ex. 13.)  As a matter of law, this is

insufficient to support a claim for false imprisonment. The alleged conduct was subsequent to a

lawful arrest.  Ross may not have been processed in the timeliest and most efficient manner, but

he was not falsely imprisoned.

### b. Article 26 of Maryland's Declaration of Rights

Ross also asserts a Maryland constitutional claim, alleging Officer Early violated Article

26 of Maryland's Declaration of Rights, which protects a person's right to be free from

unreasonable seizures.  *See* Md. Const. Decl. of Rights. § 26 ("That all warrants, without oath or

affirmation, to search suspected places, or to seize any person or property, are grievous and

oppressive; and all general warrants to search suspected places, or to apprehend suspected

persons, without naming or describing the place, or the person in special, are illegal, and ought

not to be granted.")  Article 26 protects the same rights as those protected under the Fourth

Amendment to the United States Constitution.  *Barnes v. Montgomery Cnty., Md.*, 798 F. Supp.

2d 688, 700 (D. Md. 2011).  Indeed, Maryland courts "have long recognized that Article 26 is *in*

*pari materia* with the Fourth Amendment."[20]  *Dent v. Montgomery Cnty. Police Dept.*, 745 F.

Supp. 2d 648, 661 (D. Md. 2010) (quoting *Richardson v. McGriff*, 762 A.2d 48, 56–57 (Md.

2000)).  As such, the disposition of Ross's § 1983 claim based on an alleged Fourth Amendment

violation dictates the same result on his Article 26 claim.  *See id.*  Probable cause therefore

defeats not only Ross's § 1983 claim, but also Ross's Article 26 claim.

     Ross's Fourth Amendment rights were not violated.  As discussed above, Officer Early

made a valid arrest.  He had what he reasonably believed was probable cause based on

witnessing Ross disobey a lawful order.  *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir. 1992)

("Whether probable cause exists in a particular situation . . . always turns on two factors in

combination: the suspect's conduct as known to the officer, and the contours of the offense

thought to be committed by that conduct.")  In sum, there is no evidence supporting Ross's claim

that Officer Early violated Ross's Fourth Amendment, and parallel Article 26, rights.

   C.  Ross's Cross-Motion for Reconsideration and Summary Judgment

     I decline to reconsider my December 8th denial of summary judgment for several reasons.

First and foremost, the legal analysis remains sound, and I do not believe a "clear error of law"

occurred such that reconsideration is necessary to "prevent manifest injustice."  *McLaughlin v.*

*Murphy*, 372 F. Supp. 2d 465, 476 (D. Md. 2004) (quoting *United States ex rel Becker v.*

*Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002)).  Second, Ross's motion

in large part reviews general principles of First Amendment law that have already been

---

[20] A major distinction, however, is that "Maryland does not recognize the defense of qualified immunity for officials committing state constitutional violations."  *Walker v. Prince George's Cnty.*, No. AW-07-123, 2008 WL 7555247, at *5 (D. Md. March 31, 2008); *see Ashton v. Brown*,  660 A.2d at 463 (citing cases, including *Ritchie v. Donnelly*, 597 A.2d 432, 444–46 (Md. 1991) and *Mason v. Wrightson*, 109 A.2d 128, 130–31 (Md. 1954)).

thoroughly discussed and debated in this case.  Third, Ross cites no change in controlling law

following the summary judgment ruling.  Finally, although Ross submits additional material

obtained during discovery, no new facts are revealed.  There is nothing that contradicts the

record underlying the court's earlier ruling.  Rather, Ross simply reiterates arguments made

earlier.[21]  As a result, the genuine dispute of fact precluding summary judgment at a prior stage

in this litigation, *see supra* section A, remains, nd Ross fails to make a persuasive argument for

why this court should conclude otherwise.  Ross's motion is therefore denied.

---

[21] The arguments Ross raises have either already been addressed, or are irrelevant.  Ross spends
a large portion of his memorandum trying to prove that the sidewalk was not impeded by his
protesting activities and that leafleting has little effect on the flow of pedestrian traffic generally.
(Ross Cross-Mot. Recons. & Summ. J. at 10–16.)  These points are misplaced. The legitimacy
and/or significance of a proffered interest in public safety cannot be challenged by showing how
one leafletter (like Ross) fails to cause a pedestrian safety issue.  The question is whether such
activity, en-mass, can potentially impact pedestrian safety.  *See Heffron*, 452 U.S. at 654.
Furthermore, I will not take the place of local decisionmakers; it remains the province of local
government to make policies aimed at ensuring public safety (so long as regulations on speech
are content neutral and meet the other requirements of a valid time, place, and manner
restriction).  Ross also argues, once again, that the Protocol's restrictions are not narrowly
tailored and do not provide ample alternative channels of communication.  (Ross Cross-Mot.
Recons. & Summ. J. at 12–14.)  I disagreed at the (first) summary judgment stage and reaffirm
that conclusion here.  The restrictions do not bar the more general dissemination of the anti-
circus and pro-animal welfare message through leafleting in the designated area, or though signs,
speeches, and other expressive activities.  *Ross*, 758 F. Supp. 2d at 322–23.  The First
Amendment does not guarantee a speaker's ideal means of communication "only that individuals
retain the 'ability to communicate effectively.'"  *Id.* (citing *Menotti v. City of Seattle*, 409 F.3d
1113, 1138 n.48 (9th Cir. 2005); *see McCullen v. Coakley,* 571 F.3d 167, 180 (1st Cir. 2009)
("[H]andbilling is not specially protected."); *Bl(a)ck Tea Soc'y v. City of Boston,* 378 F.3d 8, 14
(1st Cir. 2004) ( "[A]lthough the opportunity to interact directly with the body of delegates by,
say, moving among them and distributing literature, would doubtless have facilitated the
demonstrators'  ability to reach their intended audience, there is no constitutional requirement
that demonstrators be granted that sort of particularized access.").  The First Amendment does
not guarantee, as Ross wishes, to have the right to be within arm's reach of everyone entering the
Arena.  The Protocol imposes a 15 foot limitation, differing significantly from the restrictions in
the cases Ross cites, which made communication virtually impossible and which the court
properly struck down.  *See Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 854 (9th Cir. 2004) (free
speech zones between 200 and 265 feet away from the main entrance to the arena); *Weinberg. v.
City of Chicago*, 310 F.3d 1029, 1035 (7th Cir. 2002) (restricted activities within 1,000 feet of
sports stadium).

IV.  CONCLUSION

For the aforementioned reasons, (1) BCPD and the City's motion for summary judgment is denied; (2) Officer Early's motion for summary judgment is granted; and (3) Ross's motion for reconsideration is denied.  A separate order is being entered herewith.


September 25, 2012                                                    /s/                       
Date                                                       J. Frederick Motz
                                                           United States District Judge